UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTINE CARMEN DOBBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. _____ |
| | ) | |
| UNIVERSITY OF TEXAS | ) | Case No. _____ |
| SOUTHWESTERN MEDICAL CENTER, and | ) | |
| | ) | |
| DIANE M. TWICKLER, in her individual | ) | **COMPLAINT** |
| capacity, | ) | **AND JURY DEMAND** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, CHRISTINE CARMEN DOBBIN, by and through their attorneys, Lento Law Group, P.C., brings this action for damages and other legal and equitable relief against Defendants UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER and DIANE M. TWICKLER (collectively, "Defendants"), alleging as follows:

### JURISDICTION AND VENUE

1.      This Court has original subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question) & 1343.

2.      This is an action for damages in vindication of Plaintiff's civil rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

3.      This action also arises under the Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 *et seq.*, amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title

II of the ADA, prohibits discrimination on the basis of disability in the provision of public services, and Section 202 of the Act, 42 U.S.C. §12132 (Supp.1991), the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both the ADA and §504 prohibit discrimination and retaliation against persons with disabilities.

4.      This Court also has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a), as such claims are so related to Plaintiff's federal claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

5.      Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Texas.

**PARTIES**

6.      At all times relevant hereto, Plaintiff CHRISTINE CARMEN DOBBIN, is an adult resident citizen of the County of El Paso, State of Texas.

7.      At all times relevant hereto, Defendant UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER is a public university and recipient of federal funds, located at 5323 Harry Hines Boulevard, Dallas, Texas 75390.

8.      At all times relevant hereto, Defendant DIANE M TWICKLER is, upon information and belief, an adult resident citizen of Dallas County, Texas, with a residential address for service of process believed to be 6913 Lakewood Blvd., Dallas, Texas 75214.

## APPLICABLE LAW AND POLICY

<u>Applicable Federal Law</u>

9.      The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

10.      Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

11.      Specifically, Title II of the ADA prohibits all state and local governmental entities, including public colleges and universities, from discriminating against people with disabilities.

12.      Similarly, under the Rehabilitation Act of 1973, specifically, Section 504, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a).

<u>Applicable UTSW Medical Center Policy</u>

13.      Defendant UTSW Medical Center's Student Assistance Committee's ("SAC"), 2019 Information Sheet, provides at paragraph 2, bullet point 2: "If a student is unable or unwilling to seek assistance, fellow students, faculty and administrators have a responsibility to identify these individuals and assist them in obtaining the most competent and effective support available."

## GENERAL FACTUAL ALLEGATIONS

14.     Plaintiff, CHRISTINE CARMEN DOBBIN, (hereinafter, "Christine") attended Defendant UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER (hereinafter, "UTSW Medical Center") from Fall 2018 until January 2022, four months before her graduation.

15.     In the Fall of 2020, shortly after the death of her aunt, Christine was diagnosed with *status migrainosus* – chronic migraines – which was partially treated through triptan-class medication and prophylactic onabotulinumtoxinA injections, i.e., Botox.

16.     In addition to migrainosus, Christine also suffers from clinically diagnosed depression and anxiety disorders, as well as Obsessive Compulsive Disorder (OCD) and Attention Deficit Hyperactivity Disorder (ADHD), and  has been under professional medical and/or psychological treatment for these conditions.

17.     On or about August 8, 2020, Christine sat for the United States Medical Licensing Examination Step-1, which is a one-day, eight-hour computerized examination that assesses second-year medical students' understanding of, and ability to apply, important concepts of subjects like anatomy, physiology, biochemistry, and pharmacology, for example, that are essential to the practice of medicine.

18.     Due to these issues and COVID closing test facilities for the STEP1 exam, Christine was allowed to test at a later date.  It should be noted that the entire 2022 class received accommodations for later test dates due to this nationwide problem.

19.     Christine asked for and received accommodations for testing, however, the process for obtaining said accommodations was very unpleasant, with various UTSW staff members involved in the process giving Christine significant pushback and exhibiting an overall attitude of disdain and reluctance.

20.    During the January 2021 term, Christine was participating in her Internal Medicine Rotation with Dr. Carol Lynn Croft.

21.    Throughout Christine's rotation, Dr. Croft praised Christine's abilities and indicated that her performance was near honors-level within the grade.

22.    Despite this praise from Dr. Croft, Croft's attitude toward Christine changed when Christine requested an absence several weeks ahead of her niece's birth on January 24, 2021, so as to have leave to go see her.

23.    Christine was not hopeful the absence would be granted as she had previously been denied absence requests she had sought for necessary medical treatment in connection with her disabilities – disabilities which were known to UTSW – nonetheless, she requested the absence all the same.

24.    Ultimately, like the absence requests before it, this absence request was also denied, and so Christine subsequently cancelled her travel plans to visit her newborn niece.

25.    In connection with Christine's denied absence request, her clerkship supervisors – Dr. Reeni Abraham and Dr. Lauren Philips – reached out to her to discuss Dr. Croft.

26.    To Christine's surprise, the discussion was not focused on Dr. Croft's denial of her absence request, but rather, of a staff evaluation which Christine had written about Dr. Croft – an evaluation which, it was Christine's understanding, would be anonymous.

27.    In her evaluation of Dr. Croft, Christine expressed concerns about conduct she had observed from Croft on more than one occasion, conduct which she perceived as mistreatment both of staff and patients, and often on the basis of race.

28.    Christine's clerkship supervisors were not receptive to her concerns about Dr. Croft and expressed that Croft was a personal friend of theirs, and thus, they found Christine's allegations dubious.

29.     It was at this time that Christine realized her grade for her rotation with Dr. Croft might be in jeopardy as a result of her critical evaluation of Croft's conduct.

30.     Immediately following this discussion with her clerkship supervisors, Christine noticed a marked difference in Dr. Croft's attitude towards her, with Croft remarking that she was "the worst medical student," and repeatedly criticizing her work, all despite the prior praise Croft had regularly bestowed upon her theretofore.

31.     Ultimately, Christine received a passing grade for her rotation with Dr. Croft, however, Croft noted the grade was a "barely pass", again, surprising, considering Croft's prior praise of Christine's performance.

32.     Overall, this rotation with Dr. Croft illustrated to Christine that her academic survival at UTSW was dependent upon not only her own performance, a factor which she could largely control, but also upon the competing interests, attitudes, and egos of the UTSW staff which, to her, appeared more and more capricious and unpredictable.

33.     Further, this rotation with Dr. Croft, and more specifically, the response she received from her clerkship supervisors with respect to the evaluation she had left for Croft, also illustrated to Christine that, in her estimation, she was now on the school's list of disfavored students.

34.     During the months that followed, specifically, in February and March of 2021, Christine, like many other millions of people, was impacted significantly by Winter Storm Uri.

35.     For background, Winter Storm Uri, also known as the February 13-17 North American Winter Storm, was an unprecedented ice storm which impacted the Pacific Northwest and moved to the Southern United States, before then moving to the Midwest and Northeastern United States several days later.

36.     It is reported that Winter Storm Uri was the deadliest winter storm in North America since the 1993 Storm of the Century, with between 426 to 978 fatalities in Texas alone, depending on the source, and further, the storm caused over 9.9 million people in the United States and Mexico to experience blackouts.

37.     The storm triggered the single worst energy infrastructure failure in Texas history, with more than 4.5 million homes and businesses left without power, some for several days.

38.     During this storm and its aftermath, Christine, like so many others, was left without power in her apartment, and further, experienced significant flooding.

39.     This was an issue that was not resolved for several weeks.

40.     As a result of being without power for several weeks, Christine could not charge her electronic devices, nor did she have internet access given that her internet router was not receiving power.

41.     Despite this, Christine nonetheless tried her best to communicate as necessary with her professors and advisors, regularly having to run to the nearest 7-Eleven convenience store or Starbucks coffee shop to utilize their outlets or Wi-Fi.

42.     During this time, Christine informed UTSW staff of her technological difficulties resulting from her apartment's ongoing lack of power, and noted that any deficiencies with respect to communication – specifically, her responsiveness to emails, for example – were attributable to these ongoing affects of Winter Storm Uri.

43.     On or about March 12, 2021, was summoned to meet with Associate Dean Dr. Blake Robert Barker.

44.     During this meeting, Dr. Barker expressed concern about Christine's professionalism, specifically noting both the evaluation she had left for Dr. Croft and the issue of her non-responsiveness to emails.

45.     With respect to the former, Christine again voiced her concern's regarding Dr. Croft's conduct and the fact that it appeared that her staff evaluation did not remain anonymous.

46.     With respect to the latter, Christine reiterated to Dr. Barker the ongoing issue she had been having with respect to her apartment's lack of power following the winter storm, and how that was the cause of her inability to timely respond to emails.

47.     Regarding the evaluation of Dr. Croft, Dr. Barker denied that staff had access to student evaluations, despite the fact that he read verbatim from Christine's evaluation of Croft during that very meeting.

48.     Regarding the lack of power at Christine's apartment, Dr. Barker was wholly unsympathetic.

49.     The meeting concluded with Dr. Barker issuing Christine her first professionalism write-up.

50.     The feeling that Christine had felt following the end of her rotation with Dr. Croft – that the school was now actively looking for an excuse to get rid of her – was reinforced following this meeting with Dr. Barker, and it was a feeling that would come to be reinforced still further.

51.     In October 2021, Christine was informed of a deadline by which she would be required to receive an influenza vaccination.

52.     She complied with this deadline, receiving a flu shot on October 15, 2021.

53.     Having received the vaccination, Christine requested that the pharmacy which administered it send verification of same to UTSW, and she called UTSW's Health Center to inform them that the pharmacy would be sending over the documentation.

54.     Despite this, however, the pharmacy failed to send the necessary proof of vaccination to UTSW's Health Center, forcing Christine to take efforts of her own to ensure the school received the verification, albeit later than she had originally anticipated, but-for the pharmacy's failure to send the documents when she had requested.

55.     On or about October 25, 2021, Christine was summoned by Associate Dean Dr. Angela Peterman Mihalic for a professionalism meeting.

56.     During this meeting, Dean Mihalic chastised Christine for her apparent failure to timely receive the flu vaccine.

57.     In response, Christine explained to Dean Mihalic that she had, in fact, received the vaccine by the imposed deadline, and informed her of the pharmacy's failure to timely forward the necessary documentation to the school.

58.     Dean Mihalic also referenced Christine's issues with respect to communication, and again Christine attributed these to a combination of a technological inability to communicate given the period of time her apartment was out of power, and more recently, her disabilities – specifically, her clinical depression and anxiety disorders – which, at their worst, caused Christine crippling anxiety such that she would self-isolate or withdraw from others.

59.     Much like Dr. Barker's dismissiveness towards Christine during their March 21st meeting, Dean Mihalic was similarly disinterested in Christine's explanations, and issued Christine her second professionalism write-up.

60.    On or about November 3, 2021, the Student Promotions Committee, citing the aforedescribed communication issues and the flu shot fiasco,  issued a determination that Christine was thereby dismissed from UTWS Medical Center, for an "egregious pattern of poor communication and failure to fulfill professional responsibilities as outlined in the UT Southwestern Medical Center Professionalism Policy." (*A true and correct copy of the Student Promotions Committee's dismissal letter is annexed hereto as* **EXHIBIT "A"**).

61.    Importantly, Christine was not permitted to attend this meeting.

62.    On or about November 12, 2021, Christine appealed the decision of the Student Promotions Committee, however this appeal was unsuccessful.

63.    Executive VP for Academic Affairs and Provost Dean Dr. W.P. Andrew Lee writes in a letter dated January 10, 2022, to Christine that, "After careful consideration, I have decided to... uphold the decision of the Student Promotions Committee dismissing you from Medical Center. I understand this outcome is disappointing; however, your academic performance does not meet the standards required of UT Southwestern medical students." (*A true and correct copy of this letter is annexed hereto as* **EXHIBIT "B"**).

64.    While Christine's dismissal letter of November 3ʳᵈ (**Ex. "A"**) made mention of two courses which Christine failed and had subsequently been placed on Academic Warning as a result of, the letter also makes clear that Christine had successfully remediated both courses during the summer of 2019 and received passing grades.

65.    There is no further discussion within the dismissal letter of academic underperformance apart from those two remediated courses, and Christine's grades throughout the rest of her attendance at UTSW were never an issue.

66.    Thus, the letter from Dean Lee upholding Christine's dismissal on entirely different grounds than those articulated in the dismissal letter of November 3rd further illustrated to Christine the fact that the school had simply made up its mind about getting rid of her and were prepared to use any multitude of excuses to justify their decision.

### COUNT I
### DISCRIMINATION UNDER THE
### AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA"), as amended, AND
### SECTION 504 OF THE REHABILITATION ACT OF 1973 ("Section 504")
### (As to All Defendants)

67.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

68.    Plaintiff is a protected disabled individual under the Americans with Disabilities Act, 42 U.S.C. § 12131-12150, where a disabled person is defined as an individual who has a physical or mental impairment that substantially limits one or more of the major life activities of an individual or who has a record of such an impairment, or an individual who is being regarded as having such an impairment.

69.    Defendant UTSW Medical Center, through its agents and authorities, including Defendant Twickler, intentionally discriminated against Plaintiff in connection with her continued enrollment as a student thereat, in violation of the ADA.

70.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance

71.    UTSW Medical Center is a recipient of federal funds.

72.     Because Plaintiff, Christine Dobbin's diagnosed migrainosus, clinical depression, anxiety disorder, and Obsessive Compulsive Disorder, both individually and collectively, substantially limit at least one of her major life activities, Plaintiff is an individual with a disability under the ADA and Section 504 of the Rehabilitation Act.

73.     The term "qualified individual with a disability" within the meaning of the Rehabilitation Act, means an individual "who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2)

74.     To prevail on her ADA claim, Plaintiff must provide that she is: (1) an individual with a disability, (2) otherwise qualified for her educational program, and (3) excluded from, denied the benefits of, or otherwise subjected to discrimination under the program by reason of a disability. *See*, Kemp v. Holder, 610 F.3d 231, 235 (5th Cir. 2010).

75.     Plaintiff is an individual with a disability; specifically, she suffers from chronic migraines, clinically diagnosed depression and anxiety disorders, as well as Obsessive Compulsive Disorder (OCD) and Attention Deficit Hyperactivity Disorder (ADHD), as aforesaid.

76.     Despite Plaintiff's disabilities, however, Plaintiff was an otherwise qualified individual, and was fully prepared to continue her medical education and training at UTSW Medical Center.

77.     To be "otherwise qualified" for a postsecondary education program, such as the one Plaintiff was participating in, an individual with a disability must satisfy the program's essential requirements, with or without the aid of reasonable accommodations. *See*, Shaikh v. Texas A&M Univ. College of Medicine, 739 Fed. App'x 215, 220 (5th Cir. 2018).

78.     Plaintiff is clearly an otherwise qualified individual as evidenced by the fact that Plaintiff, by the time she was dismissed UTSW Medical Center, had already completed roughly three-and-a-half years of the program, and had only approximately four more months until graduation.

79.     Further, but-for Winter Storm Uri causing the power outage which created the communications issue for Plaintiff – an issue which, importantly, had never been brought to Plaintiff's attention in the preceding three-and-a-half years she was attending UTSW Medical Center – and but-for the poor, but truthful, evaluation which Plaintiff left for Dr. Croft, it seemed wholly likely that Plaintiff would have continued on for the remaining four or so months that she had left to complete of the program.

80.     Despite Plaintiff's otherwise qualified status, however, Defendant UTSW Medical Center discriminated against Plaintiff on the basis of her disabilities, and ultimately dismissed her from the University, thereby excluding her from, and denying her the benefit of, the educational program, on the basis of her disabilities, in violation of the ADA and Section 504.

81.     Specifically, on or about November 3, 2021, the Student Promotions Committee, issued a determination that Christine was thereby dismissed from UTSW Medical Center, for an "egregious pattern of poor communication..."

82.     While, as aforesaid, much of the poor communication was attributable to the technological difficulties Plaintiff faced as a result of the loss of power caused by Winter Storm Uri, Plaintiff's self-isolation and withdrawal from others were also direct symptoms and/or manifestations of Plaintiff's diagnosed clinical depression, anxiety disorder, and chronic migraines – a fact which Plaintiff made Defendant UTSW Medical Center aware of, both at the time these concerns were brought to her attention, and during the subsequent appeal process.

83.    Specifically, regarding Plaintiff's communication deficit, in her letter appealing the determination of the Student Promotions Committee ("SPC") to dismiss her, Plaintiff related to Defendant UTSW Medical Center that in addition to implementing a number of technological safeguards to ensure internet connectivity and email prioritization, she was also actively working with her doctors to attempt to remedy the way in which her disabilities adversely impacted her cognitive and communicative functioning. Plaintiff writes:

> In order to help mitigate unforeseen circumstances... and manage communication optimally given challenges imposed by my health conditions, I have sought and implemented a multitude of tools... I have worked with my doctors to adjust my medications and therapy as to safeguard my working memory. I have added tools to assist with the necessary digital screen time required in the context of severe asthenopia and vestibular symptoms that accompany my migraine attacks. I plan to continue these measures while also implementing a daily schedule for reviewing and responding to emails stratified by urgency and importance... My doctors are working with me to adjust my medication so that my functioning is at its best.
>
> (*A true and correct copy of this appeal letter is annexed hereto as* **EXHIBIT "C"**).

84.    In determining to uphold the SPC's decision to dismiss Plaintiff, Defendant Diane M. Twickler, Executive Vice President for Academic Affairs and Provost Dean, explicitly identified five bases upon which she came to this decision:

a.    Plaintiff's failure of the Organism and Host course;

b.    Plaintiff's failure of the Cardiovascular block in the Integrated Medicine block;

c.    Plaintiff's July 2020 request for an extension of her study time beyond the ten weeks which were granted in addition to spring break;

d.    Plaintiff's Physician Evaluation form of March 12, 2021, noting Plaintiff's failures in communication; and

     e.   Plaintiff's Physician Evaluation form of October 28, 2021, noting the flu vaccination described in more detail earlier herein, and noting further non-responsiveness to emails.

     (*A true and correct copy of Ms. Twickler's recommendation is annexed hereto as* **EXHIBIT "D"**).

85.    Regarding Plaintiff's failure of the Organism and Host course and the Cardiovascular block in the Integrated Medicine block (a. & b. above), even Defendant Twickler admits in her recommendation that Plaintiff, "successfully remediated both courses in the summer of 2019." (**Ex. "D"**)

86.    Given that successful remediation, Plaintiff's prior failure of those courses were – or at least, should have been – immaterial to the decision to dismiss Plaintiff.

87.    Defendants cannot provide a student with the opportunity to remediate a failed course, yet upon doing so, proceed to lord their prior failure over them for the remainder of their academic career.

88.    Additionally, apart from those two remediated courses, and Plaintiff's grades throughout the rest of her attendance at UTSW were never an issue, and she appeared on track to graduate, especially considering she passed both her STEP 1 and STEP 2 exams on her first attempt.

89.    Thus, it appears clear that Plaintiff's dismissal was <u>not</u> based on her academic performance.

90.    Regarding Plaintiff's July 2020 request for additional study time (c. above), Defendant Twickler indicates that, "This additional extension was not granted." (**Ex. "D"**)

91.    Nonetheless, even despite the denial by Defendant UTSW Medical Center of a reasonable accommodation in connection with Plaintiff's disabilities, again, Plaintiff's grades throughout the rest of her attendance at UTSW were not unsatisfactory.

92.     Therefore, the only two remaining bases (d. & e. above) upon which Defendant Twickler, and thus, Defendant UTSW Medical Center as a whole, based its decision to dismiss Plaintiff, were the Physician Evaluation forms of March 12, 2021, and October 28, 2021, citing concerns with respect to Plaintiff's deficit in communication – a deficit which, again, were largely symptoms and/or manifestations of Plaintiff's disabilities which were known to the Defendant UTSW Medical Center.

93.     In a roundabout and likely intentionally vague way, Defendant Twickler herself acknowledges that the communication deficit is a result of Plaintiff's disabilities, stating:

> [Plaintiff's] appeal letter alluded to multiple issues with communication, some of which were technical, but many of which were based on a personal and largely ineffective approach to these correspondences. I am sympathetic to the personal circumstances described in the appeal. However, in my academic judgment [Plaintiff] has failed to meet the academic standards of the medical school, with or without reasonable accommodations. (**Ex. "D"**)

94.     Despite acknowledging that Plaintiff's communication deficit was due in large part to Plaintiff's "personal circumstances" – Defendant Twickler's chosen euphemism for "Plaintiff's disabilities" – she nonetheless proceeds to recommend not overturning the SPC's decision to dismiss Plaintiff on the entirely invented basis that, "Plaintiff has failed to meet the academic standards of the medical school," which, as stated earlier, is clearly false, given Plaintiff's remediation of the two failed courses, Plaintiff's satisfactory grades thereafter, and Plaintiff's having passed both the STEP 1 and STEP 2 exams on her first attempt.

95.     Therefore, it is clear that Defendant Twickler, and by extension, Defendant UTSW Medical Center, even by their own admission, dismissed Plaintiff because of the communication deficit caused in large part by Plaintiff's disabilities, and upon realizing the potential legal ramifications such a dismissal could have for the school, said Defendants proceeded to invent an incoherent

rationale based on Plaintiff's academics – which were not unsatisfactory – so as to provide cover in the form of an alternative, non-discriminatory basis for her dismissal.

96.     Therefore, with respect to Plaintiff – an individual with a disability as defined under the ADA and Section 504 – the Defendants have excluded her from, denied her the benefits of, or otherwise subjected her to discrimination under the educational program – a program which she was otherwise qualified for – and they have done so by reason of Plaintiff's disability, in gross violation of both the ADA and Section 504 of the Rehabilitation Act.

<u>**COUNT II**</u>
**BREACH OF CONTRACT**
**(As to Defendant University of Texas Southwestern Medical Center)**

97.     Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

98.     Plaintiff contracted with Defendant UTSW Medical Center for the provision of a certain educational program and educational services in connection therewith.

99.     Plaintiff fulfilled her obligation pursuant to said contract by tendering payment to the Defendant, whether personally or through a third-party payor, for the provision of said educational program and services.

100.    Plaintiff further fulfilled her obligation pursuant to said contract by performing thereunder, in that she attended to the academic requirements of the educational program such that she was on track to graduate.

101.    Defendant UTSW Medical Center, through its agents and authorities, has breached its contract with the Plaintiff in that it has not fully performed, has breached the implied covenant of good faith and fair dealing, and has misrepresented material contract terms to Plaintiff.

102.    Specifically, Defendant has not fully performed in that it failed to completely tender the educational program for which Plaintiff contracted, despite no genuine or excusable failure to perform on Plaintiff's part.

103.    Additionally, Defendant has breached the implied covenant of good faith and fair dealing in that Defendant has not dealt truthfully with Plaintiff, as articulated more fully in Count I.

104.    Specifically, Defendant UTSW Medical Center – in attempting to justify its failure to fully perform, or in other words, its failure to provide Plaintiff the complete educational program that she contracted for – has invented a fictitious prior breach on Plaintiff's part, that being, that "Plaintiff has failed to meet the academic standards of the medical school," which, as stated earlier, is clearly false, given Plaintiff's remediation of her two failed courses and Plaintiff's satisfactory grades thereafter.

105.    Alternatively, Defendant UTSW Medical Center – in attempting to justify its failure to fully perform, or in other words, its failure to provide Plaintiff the complete educational program that she contracted for – is relying on a prior breach on Plaintiff's part, that being, that Plaintiff did not sufficiently communicate as required by the educational program; however, in so doing, is violating the law, specifically, the ADA and Section 504, as articulated more fully in Count I.

106.    Finally, Defendant UTSW Medical Center has misrepresented material contract terms regarding the support services that the school would provide to its students, such as Plaintiff, as will be articulated more fully in Count III.

107.    As a direct and proximate result of the foregoing breaches by Defendant UTSW Medical Center of its contract with Plaintiff, Plaintiff has been caused to sustain damages.

**COUNT III**
**NEGLIGENCE**
**(As to Defendant University of Texas Southwestern Medical Center)**

108.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

109.    Defendant UTSW Medical Center, as a public university and recipient of federal funds, owed Plaintiff, as one of its students, a duty of care in the conduct and administration of its educational program.

110.    Specifically, and among other duties, Defendant UTSW Medical Center owed Plaintiff a duty to abide by the provisions of the ADA and Section 504.

111.    As articulated more fully in Count I, Defendant UTSW Medical Center has violated the ADA and Section 504.

112.    But-for Defendant's breach of the ADA and Section 504, Plaintiff would not have suffered the harm herein complained of.

113.    It is reasonably foreseeable that a student similarly situated to Plaintiff – in other words, an otherwise qualified student suffering from a disability – could suffer harm if a university, such as Defendant UTSW Medical Center failed to abide by the provisions of the ADA and Section 504 and actively discriminated against them or excluded them from or denied them the benefits of the educational program on the basis of their disability.

114.    Thus, as a direct and proximate result of Defendant UTSW Medical Center's violation of the ADA and Section 504, said Defendant has breached its duty to Plaintiff, and have caused Plaintiff to incur damages thereby.

115.    Additionally, Defendant UTSW Medical Center owes Plaintiff a duty of due care to abide by the provisions of its own internal policies.

116.    Specifically, and as relevant herein, Defendant UTSW Medical Center's Student Assistance Committee's ("SAC"), promulgated the following internal policy in its 2019 Information Sheet:

> If a student is unable or unwilling to seek assistance, fellow students, **faculty and administrators have a responsibility** to identify these individuals and assist them in obtaining the most competent and effective support available. (Emphasis added)

117.    This provision makes clear that in addition to fellow students, faculty and administrators of Defendant UTSW Medical Center have "a responsibility" – or, in other words, an affirmative duty – to identify students in need of assistance and/or support services, and who are unable or unwilling to seek same on their own, and to then proceed to assist these individuals in obtaining "the most competent and effective support available."

118.    Defendant UTSW Medical Center voluntarily undertook this duty and disseminated the material outlining this duty to the student body, and therefore, it should be expected to be held to the standard that it set for itself.

119.    To that end, Defendant UTSW Medical Center has breached its duty to Plaintiff as set by this internal policy provision.

120.    Specifically, and as articulated more fully elsewhere herein, Defendant UTSW Medical Center, did not, in fact, assist Plaintiff in obtaining the most competent and effective support available in connection with the challenges she was facing as a result of her disability.

121.    In fact, quite the opposite – Defendant was largely unsympathetic to Plaintiff's struggles, as continuously evidenced by their repeated disregard for her explanations regarding her communication deficit as being symptoms and/or manifestations of her disabilities.

122.    At no time did Defendant, nor any agent thereof, attempt to assist Plaintiff in seeking support services; rather Plaintiff was left to do so on her own, ultimately consulting her doctors and implementing various measures to attempt to remediate her communication deficit. (**Ex. "C"**).

123.    But-for the failure of Defendant UTSW Medical Center to abide by its own internal policy by assisting Plaintiff in obtaining the support services her disability necessitated, Plaintiff would have had the benefit of said services and it is reasonably likely that Plaintiff's communication deficit would have been remediated so as to forestall her dismissal from the educational program.

124.    It is reasonably likely that a similarly situated student as Plaintiff in need of support services could face adverse educational consequences if the school fails to affirmatively provide said support services to the student.

125.    Thus, as a direct and proximate result of Defendant UTSW Medical Center's failure to abide by its own internal policy by failing to assist Plaintiff in "obtaining the most competent and effective support available", Defendant UTSW Medical Center has caused Plaintiff to incur damages.

## COUNT IV
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
### (As to Defendant Diane M. Twickler)

126.    Plaintiff incorporates and re-alleges, by reference, each allegation in all the preceding paragraphs of this Complaint as though set forth at length herein.

127.    42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution **and laws**, shall be liable to the party injured in an action at law...

(Emphasis added)

128.   42 U.S.C. § 1983 provides a private right of action for damages to individuals who are deprived of any rights, privileges or immunities protected by the Constitution or federal law, by any person acting under color of law.

129.   Defendant Diane M. Twickler (hereinafter, "Twickler") is a "person" within the meaning of 42 U.S.C. § 1983, and was, at all times complained of herein, acting under color of law, as the Executive Vice President for Academic Affairs and Provost Dean for Defendant UTSW Medical Center, a public university.

130.   Defendant Twickler, in her individual capacity, has deprived Plaintiff of her rights, privileges, or immunities protected by the ADA and Section 504 of the Rehabilitation Act, as articulated more fully in Count I herein.

131.   Defendant Twickler is not entitled to a defense of qualified immunity for her said violations of these federal law, as she violated Plaintiff's clearly established statutory rights under the ADA and Section 504, which not only a reasonable person would have known, but which she specifically, given her position as Executive Vice President for Academic Affairs and Provost Dean for Defendant UTSW Medical Center, would have known.

132.   Specifically, a reasonable person, particularly one in Defendant Twickler's position, would have known that it was a violation of Plaintiff's clearly established rights as arising under the ADA and Section 504, to dismiss her from her educational program on the basis of her disability, as was the case herein.

133.   Defendant Twickler thus acted intentionally and with callous disregard for Plaintiff's clearly established rights.

134.    As a direct and proximate result of Defendant Twickler's violation of Plaintiff's clearly established rights under the ADA and Section 504, Plaintiff has been caused to suffer damages, including, but not limited to, lost educational and career opportunities, diminished earning capacity, inconvenience, mental and emotional anguish, and other compensatory damages in an amount to be determined at trial.

135.    Pursuant to 42 U.S.C. §1983, Defendant Twickler is individually liable to Plaintiff for her damages.

136.    Further, pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to her attorneys fees incurred in connection with bringing this action in vindication of Plaintiff's rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CHRISTINE CARMEN DOBBIN, prays for relief as to all Counts as follows:

1) For judgement against the Defendants jointly, severally, and alternatively, for general, compensatory, punitive, and exemplary damages, with interest;

2) Reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. 1988, and

3) For such other further relief as the Court may deem equitable and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure.

Respectfully Submitted,

**LENTO LAW GROUP, P.C.**

Dated: <u>April 4, 2023</u>     _____

KELLI E. PALMAROZZI, ESQUIRE
TX Bar No.: 24049416
WELLS FARGO PLAZA
221 N. KANSAS STREET, SUITE 700
EL PASO, TX 79907
(T) (915) 206-3510
(F) (915) 206-3511
kepalmarozzi@lentolawgroup.com